CONN LAW, PC
ELLIOT CONN          Bar No. 279920
354 Pine Street, 5th Floor
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941
elliot@connlawpc.com

VARNELL & WARWICK, P.A.
JANET R. VARNELL (*pro hac vice*)
BRIAN W. WARWICK (*pro hac vice*)
MATTHEW T. PETERSON (*pro hac vice*)
1101 E. Cumberland Ave., Suite 201H, #105
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com
mpeterson@varnellandwarwick.com

Attorneys for Plaintiff Ying Ying Guan and the potential class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YING YING GUAN, individually, on behalf of all others similarly situated, and on behalf of the general public<br><br>Plaintiff.<br><br>vs.<br><br>MERCEDES-BENZ USA, LLC; and DOES 1 through 50, inclusive,<br><br>Defendants.<br>_____/ | **Case No. 4:20-cv-05719 (JST)**<br><br>**PLAINTIFF YING YING GUAN'S SURREPLY IN SUPPORT OF OPPOSITION TO DEFENDANT MBUSA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Judge:      Jon S. Tigar<br><br>Date:       Hearing Vacated<br>Time:       N/A<br>Courtroom: 6, 2nd Floor<br>Trial Date: N/A |

I.   INTRODUCTION

Despite Defendant Mercedes-Benz USA, LLC's ("MBUSA") receipt of Plaintiff's Opposition to its Motion to Dismiss (Dkt. 25), which addresses in detail the deficiencies with MBUSA's then-pending "extended warranty and reimbursement campaign" (the "Campaign"), MBUSA still chose to "launch" the "Campaign," without modification. The "Campaign," as presented, provides inadequate and incomplete relief to Plaintiff and the putative class.

Among its shortcomings, MBUSA has made no effort to "fix" the underlying camshaft adjuster defect (*i.e.* that they fail every 50,000 miles), instead, it has indicated that it will swap one defective part for a new defective part, albeit for a longer period of time. Until MBUSA actually "fixes" the defect, the underlying issues remain, and once the extended warranty expires, Plaintiff and the class will again be required to pay thousands of dollars to have the camshaft adjusters on their vehicles replaced, at approximately every 50,000 miles.

At most, the "Campaign" acts as a partial "Band-Aid" to delay some the adverse consequences of the unremedied but obvious underlying defect. It is not the type of "complete remedy" that would warrant "prudential" dismissal of the case. *See Winzler v. Toyota Motor Sales U.S.A., Inc.* (10th Cir. 2012) 681 F.3d 1208, 1215. Because MBUSA still has not provided a "complete remedy" to Plaintiff and the class, the "launch" has no impact on Plaintiff's claims or the pending Motion to Dismiss. As such, the Motion should be denied.

II.   THE "CAMPAIGN" DOES NOT PROVIDE A "COMPLETE REMEDY"

Even with the benefit of Plaintiff's input through pre-litigation correspondence and the Opposition to the Motion to Dismiss, the "Campaign" remains inadequate and does not provide all the relief sought. (*See* Declaration of Elliot Conn, ¶¶2-7, Exhibits A, B, C). An incomplete remedy does not "moot" or impact the "prudential ripeness" of the case:

  A.   <u>**MBUSA Does Not Claim to Have "Fixed" the Underlying Defect**</u>

As an initial matter, the "Campaign" *does not* purport to remedy the underlying camshaft adjuster defect. Plaintiff has alleged that the "Subject Vehicles contained a latent design defect that would result in his vehicle being rendered non-drivable and requiring engine repairs at the cost of thousands of dollars approximately every 50,000 miles" (FAC ¶ 114, *see also* ¶¶ 2, 4, 5,

22, 28, 92, 95, 96). Even with an extended warranty, until the underlying issue is remedied (*i.e. better* designed camshaft adjusters installed on the Subject Vehicles) Plaintiff and class members will continue to have to pay thousands of dollars to have the camshaft adjusters on their vehicles replaced, once the extended warranty period ends. (FAC, ¶ 22, 23, 96, 114).

Critically, MBUSA *does not* contend that its "Campaign" will provide Plaintiff and class members with camshaft adjusters that will not prematurely fail; it merely asserts that it will be replacing old defective parts with new defective parts. (Dkt. 33-2, Exh. A). It is evident that the "Campaign" does not "fix" the underlying issue and thus does not provide the type of "complete remedy" that could warrant prudential dismissal. *See Winzler*, 681 F.3d 1208, 1211 (prudential dismissal is only appropriate when a court ruling will not provide "even a sliver of additional relief"). Because the vehicles will remain defective, the case should remain "live."

And rather than assert that the "Campaign" provides a "complete remedy" or "fixes" the problem, MBUSA paradoxically continues to deny that there is any defect at all. (*See* Dkt. 33, pp. 7-12). MBUSA cannot have its cake and eat it too. Either the camshaft adjusters are defective and that is why it is replacing them under an extended warranty or the camshaft adjusters are not defective and they have no need for replacement or warranty extension. Until MBUSA chooses which path to take, this Court cannot dismiss the case because a genuine issue of material fact exists with regard to these camshaft adjusters. Until MBUSA admits to the defect and "fixes" the issue, a mere warranty extension is an inadequate remedy.

The cases MBUSA relies on do not hold otherwise. For example, in *Elkins v. Am. Honda Motor Co.*, 8:19-cv-00818-JLS-KES, 2020 WL 4882412 (C.D. Cal. July 20, 2020), American Honda Motor Co., Inc., the manufacturer of a line of vehicles with the defective A/C condensers, admitted that the A/C condenser at issue was defective and offered to replace the condensers with ones that worked properly. Honda wrote to its customers and dealerships: "This warranty only covers vehicles that have a defective air conditioning condenser installed at the factory. The A/C condenser was not manufactured to specification. As a result, tiny holes may develop in the condenser tube walls that allow refrigerant to leak out." (Request for Judicial Notice, Exhibit A Declaration of Brad Ortloff, Exhibits 1 and 2); *see also Elkins*, 2020 WL 4882412, at *1.

In *Elkins*, the A/C condensers that *were not* manufactured to specification were replaced with ones that *were* manufactured to specification. The plaintiffs in *Elkins* could not credibly dispute that the condenser defect had been actually remedied or that Honda was offering complete reimbursement of out-of-pocket expenses. *Id.* at *3, *5. Based on the existence of a *complete* remedy, the *Elkins* court dismissed the case on prudential grounds because the issue was "fixed."

All of the other cases cited make explicit findings that the relevant NHTSA recall "fixed" the underlying defect. *See Cheng v. BMW of N. Am., LLC*, No. CV 12-09262 GAF SHX, 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (granting motion to dismiss on mootness grounds, in part, because "[t]he recall fix—a software upgrade—became available in March 2013, and resolves the rollaway problem."); *Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 375 (6th Cir. 2015) (affirming motion to dismiss case as moot where "New Chrysler had already acknowledged the defect in the airbag systems, promised to repair the defect for free as quickly as possible, and did in fact repair the plaintiffs' vehicle . . ."; *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1209 (finding case prudentially moot due to "nationwide recall of 2005–2008 Toyota Corolla and Corolla Matrix cars to fix their ECMs"). Of course, the first step to providing complete relief is admitting, like Honda, Toyota, BMW and Chrysler did, that the part at issue was defective. Once the defect is admitted, a fix can be made. Here, MBUSA refuses to even take this first step.

But without an admission of defect and a "fix," Plaintiff's claims must remain active. As one district court recently held, "Plaintiffs argue that the Recall inadequately addresses the Alleged Defect. Because the Recall allegedly does not provide Plaintiffs with the full relief they seek, the Court finds that the doctrine of prudential mootness does not warrant dismissal of Plaintiffs' claims for equitable relief." *Peckerar v. Gen. Motors, LLC*, No. EDCV182153DMGSPX, 2020 WL 6115083, at *6 (C.D. Cal. Aug. 17, 2020) (*citing Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 681–82 (E.D. Pa. 2011) (declining to dismiss case as moot where "Plaintiff challenges the adequacy of the Recall, arguing that the proposed solution would not remedy the defect in its entirety, and would not result in an award of money damages.")).

**B.     The MBUSA "Campaign" Provides an Inadequate and Incomplete Replacement Remedy**

The replacement remedy that MBUSA claims to have offered through its "Campaign" does not even provide complete *temporary* relief. When Plaintiff Ying Guan's camshaft adjusters failed and needed to be replaced, she also had to pay to replace other damaged parts including the "timing chain tensioner and related seals and gasket" (FAC ¶¶ 27, 35, 38). Ms. Guan's experience is consistent the experience of other putative class member consumers that have made complaints to NHTSA.[1]

Despite the need to replace these other incidental parts, the MBUSA "Campaign" only provides for the replacement of the camshaft adjusters. According to MBUSA, consumers will need to pay out-of-pocket for all the components that have to be replaced in conjunction with the defective camshaft adjusters, including the timing chain tensioner:

> This warranty extension only covers replacement of the camshaft adjusters . . .
>
> This extended warranty *does not* cover any other engine or electrical components beyond the ones mentioned above . . .
>
> In the case of failure of any other engine or electrical system component other than the aforementioned part beyond the vehicle's basic warranty of 4 years/ 50,000 miles, the associated repair will not be covered and will remain your responsibility.

(Dkt. 33-2, Exhibit B)

And the MBUSA "News Channel Update" that it has sent to its dealers contains a similar limitation that a "parts kit can only be claimed for the replacement of the camshaft adjuster . . ." (*Id.*, Exhibit A)

For this case to be dismissed, a complete remedy must be available. Any *complete* remedy would therefore include replacement of the damaged attendant components. Class members should not be forced to incur these substantial additional costs. In the Honda and

---

[1] *See* FAC ¶ 44, "I TOOK THE CAR TO THE MECHANIC AND HE SAID IT IS THE CAMSHAFT ADJUSTER/ACTUATORS. WHICH NEED TO BE REPLACED ALONG WITH THE TIMING CHAIN."; "THE ENGINE INTAKE AND EXHAUST CAM SHAFT ADJUSTERS, TIMING CHAIN TENSIONER BROKE."; "THE CONTACT WAS ADVISED THAT THE CAMSHAFT AND TIMING CHAIN NEEDED ADJUSTMENT."

Toyota cases cited above, there were no such payments forced upon the consumer. The manufacturer paid to replace all the necessary components.

In fact, MBUSA is not even offering to replace *all* defective camshaft adjusters, only those that fail "a short test with fault code attached" (*Id.*) Already, MBUSA's dealerships have refused to replace the camshaft adjusters on "covered" vehicles. (*See* Declaration of Samuel Dungan; Declaration of Aja Arrindell). Those class members and other customers who are experiencing the defect but do not have active fault codes will continue to be denied any repairs under the "Campaign." This is not complete relief.

### C. The MBUSA "Campaign" Offers an Inadequate and Incomplete Refund Remedy

Unlike the cases cited above, the "Campaign's" "refund" remedy is similarly facially inadequate as MBUSA has reserved the unfettered ability to deny any claim for reimbursement:

> If your vehicle has exceeded the original warranty's mileage or time period, and you have already paid to have your camshaft adjuster replaced due to the above described condition, you *may* be eligible to receive reimbursement under this warranty extension. Reimbursement for your replacement costs can be obtained by presenting *adequate documentation* to your authorized Mercedes-Benz dealer. Requests for reimbursement may include expenses for Mercedes-Benz replacement parts, labor, fees, and taxes. Reimbursement *may be limited* to the amount the repair would have cost if completed by an authorized Mercedes-Benz dealer. . . . Repairs performed by a non-Mercedes-Benz dealership *might not* be reimbursed.

(Dkt. 33-2, Exh. B, emphasis added)

Certainly, if MBUSA will not be replacing damaged timing chain tensioners, it will not be providing refunds for the same parts. And its conditional offer to provide a partial "refund," subject to MBUSA's unregulated discretion to deny any request, is a far cry from the mandatory Reimbursement Plan required under the Motor Vehicle Safety Act. 49 U.S.C. § 30120(d), 49 C.F.R. § 573.13 (strictly regulating "Reimbursement for pre-notification remedies").

Importantly, MBUSA still specifically reserves the right to deny *any* refund to customers like Ying Guan who have had "[r]epairs performed by a non-Mercedes-Benz dealership . . ." in order to save money after being denied relief from MBUSA and its dealers. (Dkt. 33-2, Exh. B). Under the "Campaign," Ying Guan and thousands of putative class members will be provided little or no remedy at all which counsels against dismissal.

### D. The Campaign Does Not Provide Any "Benefit of the Bargain" Remedy

Because MBUSA has not "fixed" the underlying camshaft adjuster issue, the Subject Vehicles remain defective and Plaintiff seeks damages for their diminished value. (*see* FAC ¶¶ 54, 56, 57, 96, 102, 114, 115, 117(b)). As courts have held in rejecting similar motions to dismiss (including those brought by Mercedes-Benz), an extended warranty does not moot claims for money damages. *McCabe v. Daimler Ag*, No. 1:12-CV-2494-MHC, 2015 WL 11199196, at *4 (N.D. Ga. Aug. 19, 2015) ("At a minimum, each Plaintiff has alleged damage in the form of the diminished value of their vehicles due to the alleged defects . . . This element of damages is not covered by the extended warranty and represents meaningful relief that the Court could arguably award to Plaintiffs even after the application of the extended warranty."); *see also Peckerar v. Gen. Motors, LLC*, 2020 WL 6115083, at *2 ("Plaintiffs assert that the Recall has not in fact remedied the Alleged Defect, and that their vehicle 'remains defective' even after undergoing the recommended repair. [ ] If the Recall repair has not fixed the defect, it did not restore Plaintiffs' vehicle to its pre-defect value.").

With a California class specifically, the diminution in value due to an emissions defect is no trifling concern. Once the camshaft adjuster defect triggers a fault code, putative class members cannot ignore the problem; they will have to pay to replace the camshaft adjusters even if they just want to sell their vehicles. In California, vehicles must "pass smog" to be sold. *See* California Vehicle Code § 4000.1(a). A Subject Vehicle with an active malfunction code related to the camshaft adjuster cannot pass and therefore cannot be sold. *See* Cal. Code Regs. tit. 13, § 1968.2(e)(15.2.1)(C)(i) ("For . . . all 2009 through 2018 model year vehicles equipped with VVT cam phasing systems and a timing belt or chain, the OBD II system shall detect a malfunction if the alignment between the camshaft and crankshaft is off by one or more cam/crank sprocket cogs"); Cal. Code Regs. tit. 13, § 3340.42.2(c)(4) ("OBD equipped vehicles shall fail the OBD ["smog"] inspection if . . . The vehicle's OBD system reports a Diagnostic Trouble Code (DTC)").

Once the vehicle's On-Board Diagnostics ("OBD") detects a camshaft malfunction and registers a fault, the consumer will need to pay to remedy the defect (*i.e.* pay thousands of dollars

to have the vehicle's camshaft adjusters and timing chain tensioner replaced), before she can sell the vehicle. A reasonable consumer certainly would have paid less for a vehicle if they had known that to eventually sell it, they may have to pay thousands of dollars. (*See* FAC ¶¶ 2, 35)

A limited extended warranty cannot offset this loss. Without a permanent "fix" for the underlying issue, the Subject Vehicles are worth substantially less. "Indeed, courts recognize that a defective vehicle is worth less than a non-defective one." *Peckerar*, 2020 WL 6115083, at *2, fn. 3 (citing *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011)).

The absence of the "fix" distinguishes the unresolved camshaft adjuster defect at issue from the remedied A/C condenser problem in *Elkins*. Again, in *Elkins*, Honda had acknowledged the underlying defect, but claimed to have not only remedied the problem, but agreed to offer an unlimited mile, 10-year warranty. *Elkins*, 2020 WL 4882412, at *1, *5. Based on this, the court rejected the plaintiffs' diminution in value claim because the remedy was complete; there was no longer a "defect" that would impact the value of the vehicles. *Id*. at *5.

In contrast, MBUSA does not claim to have remedied the underlying defect. Once the Subject Vehicles hit 120,000 miles, they will be useless as the cost to repair the camshaft adjusters may be greater than the value of the vehicles themselves. And even before the mileage limit is hit, prospective purchasers will be willing to pay less, now that it is publicly known that once a 2012-2014 C250 hits 120,000-miles, it becomes prohibitively expensive to keep running.

E. **MBUSA has Failed to Demonstrate that Putative Class Members Will Receive Sufficient (or Any) Notice of the "Campaign"**

Had MBUSA found a "fix" for the defect and subjected itself to a voluntary recall under the Motor Vehicle Safety Act, it would have been bound by strict procedures, Federal NHTSA oversight, and stiff penalties for non-compliance. *See Winzler*, 681 F.3d 1208, 1209.

Under a NHTSA recall, MBUSA would be required to provide notification, within 60 days, "by first class mail to each person who is registered under State law as the owner of the vehicle and whose name and address are reasonably ascertainable by the manufacturer through State records or other sources available to him. If the owner cannot be reasonably ascertained, the manufacturer shall notify the most recent purchaser known to the manufacturer." 49 C.F.R. §

577.7(a), 49 U.S.C. § 30119(d). Alternatively, if MBUSA were to provide class relief, the "best notice that is practicable under the circumstances" would be provided. FRCP Rule 23(c)(2)

Even with NHTSA oversight, MBUSA has a demonstrated history of recidivism regarding providing its customers with notifications of recalls. In fact, in December 2019, MBUSA was forced to pay a fine to NHTSA of between $13 and $20 million for its failure to submit timely and adequate customer notifications in dozens of recalls. (*See* Request for Judicial Notice, Exhibit B Settlement Agreement between NHTSA and MBUSA, §§ 2, 3.)

Despite asking for the removal of any oversight, MBUSA makes no effort to explain *how* (or if) customers have been notified of the "Campaign" or what measures have been put in place to ensure that all owners receive notice of the "Campaign." It should come as no surprise that putative class members *have not* received notification of the "Campaign," even when MBUSA has their last known address in its records. (*See e.g.* Declaration of Elina Ring Grande).

MBUSA's failure to make any showing of appropriate notice is also fatal to its motion. Without adequate notice, "any potential recovery of [ ] damages that could inure to class members through a refund program is therefore somewhat illusory, as compared to a class action remedy." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 553 (E.D.N.Y. 2017). Stated another way, "[i]f consumers do not realize the ["Campaign"] exists, it cannot be a superior alternative to a class action." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 416 (S.D.N.Y. 2015).

F. **MBUSA Has Failed to Introduce Evidence That the "Campaign" Will Be Subject to *Any* Regulatory Oversight**

While MBUSA makes vague allusions to requirements under "EPA and CARB" regulations, at no point does it explicitly state that it has subjected itself to either entity's oversight or what such oversight would entail. MBUSA *does not* state that it has submitted to the EPA "a report describing the manufacturer's voluntary emissions recall plan as prescribed by this section within 15 working days of the date owner notification was begun." 40 C.F.R. § 85.1904(a).[2] Nor would the "extended warranty and reimbursement campaign" qualify as an EPA "voluntary emissions recall." 40 C.F.R. § 85.1902(d) ("Voluntary emissions recall means a

---

[2] Similarly, MBUSA does not assert that it has notified "the Executive Officer [of CARB] of the recall at least 30 days before owner notification is to begin." Cal. Code Regs. tit. 13, § 2113(a)

repair, adjustment, or modification program voluntarily initiated and conducted by a manufacturer *to remedy any emission-related defect* for which direct notification of vehicle or engine owners has been provided. . ."). To the contrary, MBUSA continues to deny that there is any defect at all. Replacing an old defective part with a new defective part will not "remedy" an emission-related defect.

The employee declarations provided by MBUSA make no mention of filing notification documents to the EPA, CARB, or any local, municipal, state and/or federal regulating entity. Nor does MBUSA present evidence of any response received from such entities.

In fact, the EPA does not even have a record of a submitted "voluntary emissions recall plan" for the 2014 C250 vehicle. (*See* Declaration of Elliot Conn, ¶¶ 10-11, Exhibit 4)

Without any judicially noticeable evidence showing that the recall will be overseen by a regulatory entity, MBUSA cannot establish that "the plaintiff has a remedial promise from a coordinate branch in hand" sufficient to moot the case. *Winzler*, 681 F.3d 1208, 1210; *see also O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 524, fn. 4 (S.D.N.Y. 2018) (declining to dismiss case as moot where "Plaintiffs do not allege, and there is no judicially noticeable evidence of, a 'remedial promise from a coordinate branch in hand,' [cite] but simply a voluntary recall effort initiated by [Defendants] without any detail as to the procedures followed or the presence of 'the great grinding gears of a statutorily mandated and administratively overseen national recall process,' [cite]")

Assuming arguendo that MBUSA has subjected itself to either EPA or CARB oversight, (even though the EPA has no record of this) MBUSA still fails to demonstrate that EPA or CARB involvement in the "Campaign" "involves the same type of strong oversight at issue in *Winzler* and *Chung*." *In re Big Heart Pet Brands Litig.*, No. 18-CV-00861-JSW, 2019 WL 8266869, at *6 (N.D. Cal. Oct. 4, 2019). Without such evidence, "the Court cannot conclusively determine that it would be treading upon the feet of a coordinate branch of government. . . . [And] this is not a case where basic fairness requires [the Court] to conclude the case is prudentially moot." *Id*. MBUSA bears the "heavy" burden of demonstrating mootness. If it

contends that EPA or CARB involvement carries the same weight as NHTSA involvement, it must explain why. Because it has not, the motion should be denied.

### III. CONCLUSION

For all the reasons set forth in the Opposition to the Motion and herein, the Court should deny MBUSA's motion.

Dated:          December 4, 2020                    CONN LAW, PC

/s/ Elliot Conn
Elliot Conn, Bar No. 279920

VARNELL & WARWICK, P.A.

/s/ Brian S. Warwick
Brian S. Warwick, Pro Hac Vice

Attorneys for Plaintiff
YING YING GUAN and the putative class